## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| ANGELA PATERNOSTRO, ET AL. | CIVIL ACTION |
| VERSUS | NO. 13-0662 |
| CHOICE HOTEL INTERNATIONAL SERVICES CORP., D/B/A/ CLARION INN AND SUITES, ET AL. | SECTION "L" (5) |

## ORDER & REASONS

Before the Court are twenty preliminary, dispositive motions from Defendants and Cross-Defendants. (Rec. Docs. 148, 192, 193, 216, 251, 254, 255, 257, 259, 260, 261, 263, 264, 265, 268, 269, 270, 272, 287, 305). Having considered the parties' memoranda and the applicable law, the Court now issues this Order and Reasons.

## I.      BACKGROUND

### A.        Procedural Background

This action arises out of the alleged presence of Legionella and Pseudomonas aeruginosa (that is, the causative agent of Legionnaires' disease) at the Clarion Inn and Suites Hotel ("the Hotel") in Covington, Louisiana. Plaintiffs allege that Defendant Choice Hotels International ("Choice") was the franchisor of the Hotel, and Defendant Century Wilshire ("CWI")[1] was the franchisee, owner, and operator of the Hotel. Initially, several Plaintiffs brought this action in state court, both as individuals and as surviving heirs, alleging that on December 4, 2012, decedent Russell Paternostro was exposed to Legionella while attending a Rotary Club meeting at the Clarion Inn and Suites Conference Center ("Clarion"). CWI removed to this Court on the

---

[1] For the sake of clarity, any reference to "CWI" in this Order and Reasons encompasses its sole shareholder, Theodora Mallick, who was brought into the litigation by Choice, which filed a third party complaint against Ms. Mallick individually, jointly, and severally. (Rec. Doc. 182).

basis of diversity jurisdiction. Thereafter, this Court consolidated the case with several other related cases that made similar factual allegations. Plaintiffs then filed an amended complaint against the original Defendants and various insurers, incorporating therein class allegations, (Rec. Doc. 94). Defendants filed amended answers (Rec. Docs. 95, 98, 110, 140, 165, 177, 179, 200). Choice also filed cross claims against CWI and various insurers. (Rec. Docs. 182, 183, 185, 331). CWI filed a cross claim of its own against an insurer. (Rec. Doc. 293). Several insurers filed cross claims of their own. (Rec. Doc. 208, 291, 292).

The claims against the hotel manager have already been dismissed. (Rec. Doc. 203). Discovery commenced, primarily focused on jurisdictional and coverage issues, in order to afford the parties and the Court an opportunity to deal with the threshold issues, prior to exploring class certification and the more substantive aspects of this case, such as causation and liability. [2] There are twenty pending preliminary, dispositive motions, which were considered at oral argument on October 22, 2014. [3] To put these motions in perspective, a review of the factual background and insurance scenarios is helpful.

### 1.      Factual Background

Plaintiffs, also serving as putative class representatives, include: (1) surviving relatives of the decedent, Russell Paternostro, including his widow Angela Paternostro, and his children Robyn Ortego and Mercedes Paternostro; (2) Gwen Newberry and Robert Newberry; (3) Marie

---

[2] As noted in the Court's amended scheduling order, the issue of class certification is not yet ripe and its resolution must await discovery following this issuance of this order and reasons. (Rec. Doc. 214). Therefore, the Court denies without prejudice all present motions which seek a ruling on class certification. The parties may re-file such motions at a later date, if appropriate.

[3] Although a motion for summary judgment on indemnity, (Rec. Doc. 255), was set for hearing on October 22, 2014, at the request of the parties this motion will be continued without date. The parties shall move to re-notice the motion for submission once it is timely. The Court urges the parties to conduct the discovery that is necessary to decide this, and any other summary judgment motion, before moving to re-notice.

Heeser; and (4) Jason Beleto.[4] (Rec. Doc. 94). The named Plaintiffs allege that they suffered injury because of negligence of Defendants between December 1, 2011 and January 28, 2013. Putative class representatives allege that they were registered guests and/or invitees at the Hotel between January 2011 and December 2012 and that Defendants' negligence caused them personal injuries, requiring medical treatment. Plaintiffs further alleged that this negligence caused or substantially contributed to the death of Russell Paternostro.

According to Plaintiffs, Choice entered into a Product Improvement Plan with CWI in December 2010 to provide a proper dehumidification system to the Hotel's hot tub and spa area. Plaintiffs say that Choice granted continuous waivers to CWI so that the dehumidification requirement went unsatisfied, in spite of multiple inspections. Plaintiffs also allege that Choice and CWI failed to properly disinfect the hot tub/spa system with a biocide. According to Plaintiffs, this negligent maintenance and operation resulted in the amplified presence of Legionella and Pseudomonas aeruginosa in the Hotel's hot tub/spa system and thereafter spread through the Hotel, causing injury and resulting damages to Plaintiffs and putative class members. Plaintiffs allege that on January 22, 2013 Louisiana state public health officials warned Defendants that hot tub samples from the Hotel demonstrated a high risk of Legionnaires disease.

Choice and CWI deny liability, including causation. (Rec. Docs. 95, 110). Choice further argues, *inter alia*, that it was the franchisor only for the Clarion Inn & Suites *brand* and did not own or operate the Hotel. It also states that it had no involvement in the use, opening, or closing of the hot tub/spa.

---

[4] Jason Beleto's claim comes individually, and on behalf of his minor child Cruz Beleto.

>2.    **Insurance Coverage**

As part of this litigation, Plaintiffs sued various insurers of Choice and CWI, pursuant to the Louisiana Direct Action Statute. Both primary and excess liability insurers have been made a part of this litigation.[5] Four primary commercial liability insurance policies govern here: (1) Merchants National Insurance Company ("Merchants"), in effect from June 27, 2011 to June 27, 2012; (2) Century Surety Company ("Century Surety"), in effect from June 27, 2012 to June 27, 2013; (3) Scottsdale Insurance Company Policy -24999, in effect from June 1, 2011 to June 1, 2012 ("First Scottsdale Policy"); and (4) Scottsdale Insurance Company Policy -27996, in effect from June 1, 2012 to June 1, 2013 ("Second Scottsdale Policy").

Each primary policy is further covered by various layers of excess policies.[6] The Merchants policy is covered, first, by an excess policy (-6925) of Allied World National Assurance Company ("First Allied World Policy"), and second, by a higher layer excess policy of Lexington Insurance Company ("Lexington").

The Century Surety policy is covered by an excess policy (-8000) of Allied World National Assurance Company ("Second Allied World Policy").

The First Scottsdale Policy is covered, first, by an excess policy of Ace Property & Casualty Company ("Ace"); second, by a higher layer excess policy (-06) of American Guarantee & Liability Insurance Company ("First American Guarantee Policy"); and third, by two higher layer excess policies: Policy -12 of the Ohio Casualty Insurance Company ("First Ohio Casualty Policy") and Policy -6899 of the National Surety Corporation ("First National Surety Policy").

---

[5] The parties have created a helpful coverage chart of these various policies, attached at Appendix A.
[6] The excess policies discussed herein are in ascending order of excess coverage.

4

The Second Scottsdale Policy is covered, first, by an excess policy (-5775) of Allied World National Assurance Company ("Allied World Choice Policy"); second, by a higher layer excess policy (-07) of American Guarantee & Liability Insurance Company ("Second American Guarantee Policy"); third, by two higher layer excess policies: Policy -13 of the Ohio Casualty Insurance Company ("Second Ohio Casualty Policy") and Policy -3669 of the National Surety Corporation ("Second National Surety Policy"); and fourth, by an additional excess policy of AIG Specialty Insurance Company (formerly known as Chartis Specialty Insurance Company) ("AIG").

## II.   PRESENT MOTIONS

The Defendants and Cross-Defendants have filed twenty preliminary, dispositive motions which were heard on October 22, 2014, which can be grouped into four main requests for relief. The first group asks this Court to either dismiss the Beleto claims or render summary judgment in their favor on these claims based on prescription.  The second group of motions, filed by many of the insurers who are joined as defendants, requests that they be dismissed from the action on the grounds of policy exclusions or other lack of coverage.  A third group of motions asks this Court to strike the class allegations in the Plaintiffs' complaint.[7] A final group of motions asks for dismissal and/or summary judgment on the various cross claims filed. The Court will address the parties' arguments in turn.[8]

### A.   Prescription of the Beleto Claims

In separate motions Defendants Allied World (Rec. Doc. 148), Choice (Rec. Doc. 192), CWI (Rec. Doc. 251), Scottsdale (Rec. Doc. 259), National Surety (Rec. Doc. 260), ACE (Rec.

---

[7] *See supra* note 3.
[8] Pursuant to the Court's amended scheduling order, numerous parties filed replies in support of their motions. In large part, these replies merely re-asserted the parties' initial arguments in support of their motions. The Court, therefore, will not address these replies except where necessary.

Doc. 264), Merchants (Rec. Doc. 268), Ohio Casualty (Rec. Doc. 272), American Guarantee (Rec. Doc. 286), and Lexington (Rec. Doc. 305) argue that the claims of the Beleto Plaintiffs should be dismissed as prescribed under Louisiana law. Most of the Defendants incorporate the arguments made by Allied World in its Motion. (Rec. Doc. 148). This action is a delictual action, and as such is governed by a one-year prescriptive period. La. Civ. Code art. 3492. Beleto's alleged exposure to the Legionella and/or Pseudomonas aeruginosa bacteria occurred on January 29, 2012, and they did not file suit until December 6, 2013, more than a year later. The Beletos allege in their complaint that prescription did not begin to run immediately because the hotel's employees endeavored to conceal the cause of action, thereby triggering *contra non valentem.* Allied World and the other defendants argue that because the Beleto plaintiffs did not file suit until more than a year after the alleged injury, their claims are facially prescribed. They argue that the principle of *contra non valentem* does not operate to suspend prescription because the cause of action was reasonably knowable by the plaintiff, as Cruz Beleto began screaming and developed rashes as soon as he entered the hot tub. Choice and CWI supplement this argument, alleging that the actions of the hotel's employees do not rise to the level of concealment necessary to trigger *contra non valentem.* (Rec. Doc. 192-1, Rec. Doc. 251-1).

The Beletos respond, alleging that *contra non valentem* is applicable to their claim. (Rec. Doc. 310).[9] They note that in their original petition, they specifically plead *contra non valentem* to avoid the running of prescription on their claims. (No. 13-06602, Rec. Doc. 1). In their complaint, the Beletos allege that Defendants' employee, Rita Bridges, told them that the hot tub did not contain anything but a small amount of chlorine. They allege that this statement, coupled

---

[9] The Beletos make their substantive argument in their Memorandum in Opposition to Century Wilshire, Inc.'s Motion to Dismiss for Failure to State a Claim or in the Alternative Motion for Summary Judgment. (Rec. Doc. 310). The remaining memoranda in opposition incorporate the substantive arguments from this memorandum.

with the fact that the hotel did not take steps to inform the Beletos that subsequent tests run on the hot tub indicated a high risk for Legionella and Pseudomonas aeruginosa, all of which is sufficient to suspend the running of prescription. They further allege that the emergency room physician was unable to diagnose Cruz Beleto's condition when it first manifested, so that they had no reason to believe that Legionella and Pseudomonas aeruginosa were involved. Additionally, the Beletos argue that much of the jurisprudence relied on by the defendants considered the applicability of *contra non valentem* at the summary judgment stage, not the motion to dismiss stage. (Rec. Doc. 316).

### B.     Coverage: Motions for dismissal based on bacteria and other policy exclusions

Numerous insurers, both primary and excess, move for dismissal based on exclusions in the respective policies: Century Surety, Merchants, Allied World, ACE, American Guarantee, Ohio Casualty, National Surety, and Lexington. Most policies contain a bacteria exclusion, while one contains a communicable disease and virus exclusion; the parties argue that Legionella and Pseudomonas aeruginosa fall within these exclusion provisions because (1) Legionella and Pseudomonas aeruginosa are bacteria and (2) Plaintiffs' original complaints explicitly label Legionella and Pseudomonas aeruginosa as bacteria.[10] The parties further argue that there are no applicable exceptions that apply. Various parties, mainly Choice, CWI, and Plaintiffs oppose. The Court will summarize the parties' arguments in turn.

### 1.     Primary Insurer – Century Surety

Primary insurer Century Surety argues that the bacteria exclusion in its policy precludes coverage for Plaintiffs' claims. (Rec. Doc. 263). Century Surety argues that its policy excludes

---

[10] The court will address any exhaustion arguments separately, *see infra* Part II.D.1.

coverage for all "bodily injury . . . arising out of, caused by, or contributed to in any way to the existence, growth, spread, dispersal, release, or escape of any mold, fungi, lichen, virus, bacteria, or other growing organism that has toxic, hazardous, noxious, pathogenic, irritating or allergen qualities or characteristics." Century Surety asserts that the bacteria exclusion has a narrow exception to allow coverage from "food poisoning" if the insured sells or serves contaminated or poisoned food or drink that caused the bodily injury to the plaintiff. Century Surety argues that there is no allegation that the food/drink exception applies, and the bacteria exclusion precludes coverage.

Three parties respond in opposition to Century Surety's motion: CWI (Rec. Doc. 307), Choice (Rec. Doc. 306), and Plaintiffs (Rec. Doc. 323). First, CWI construes Century Surety's position as being that Plaintiffs allegedly "inhaled" or "ingested" the bacteria. Because those words are not within the exclusion, coverage must apply. CWI emphasizes that Plaintiffs reference the mist and vapor in the hotel's dehumidification system, and noting that the Centers for Disease Control and Prevention ("CDC") webpage on Legionella, cited by Century Surety, lists inhalation as causing the disease. Second, CWI and Choice also argues that the food/drink exception applies because Plaintiffs' allegations involve food and drink at the Hotel's restaurant: Gwen and Robert Newberry, for example, allege that they ate lunch at the facility. (Rec. Doc. 307 at 11). Third, CWI argues that that Policy's "Swimming Pool Coverage Buy Back" explicitly provides coverage for the maintenance of a swimming pool, which includes a hot tub as defined by the Louisiana Administrative Code. La. Admin. Code. tit. 51, part XXIV, § 103. At the very least, CWI argues, this ambiguity points towards coverage. Fourth, Plaintiffs further argue that Century Surety's lack of a clear definition of "bacteria" in the policy, along with the

Pollution exclusion, require coverage, as ambiguities in a policy must be construed in favor of the insured.[11]

Century Surety replies. (Rec. Doc. 354). Largely, it rebuts Plaintiffs' arguments regarding the applicability of the pollution exception.

### 2.      Primary Insurer – Merchants

Primary insurer Merchant argues that the communicable diseases exclusion in its policy precludes coverage for Plaintiffs' claims. (Rec. Doc. 268). Merchants argues that its policy excludes coverage for any claim "arising in whole or in part, directly or indirectly out of, or which is in any way related to any communicable disease. . ." Merchants cites the CDC and dictionary definitions of a communicable disease in support of its argument that the plain meaning of a communicable disease includes Legionella and Pseudomonas aeruginosa bacteria. Merchants also cites a Louisiana state court case, *Alexis v. Southwood Ltd. P'ship.*, 2000-1124 (La. App. 4 Cir. 7/18/01); 792 So. 2d 100.

Three parties respond in opposition to Century Surety's motion: CWI (Rec. Doc. 333), Choice (Rec. Doc. 311), and Plaintiffs (Rec. Doc. 324). All three parties argue that Legionella and Pseudomonas aeruginosa are not communicable diseases, thus are not excluded from coverage. The parties note that communicable diseases require transmission *from* person *to* person, whereas Legionella is not spread from person to person, but rather *from* Legionella and Pseudomonas aeruginosa.[12] Second, Choice notes that the Merchants policy provides coverage for pollutants where bodily injury is caused by vapor from equipment used to heat the building.

---

[11] As discussed in detail below, *infra* Part III.D.1, Plaintiffs clarified at oral argument that they do not deny that Legionella and Pseudomonas aeruginosa are bacterial agents. Rather, they focus their arguments on the contention that the language of the various policies is ambiguous.

[12] Merchants, in its reply, disputes this interpretation of a "communicable disease." (Rec. Doc. 361).

Choice emphasizes that here Plaintiffs allege contamination through the HVAC system, thus coverage applies.

### 3.    Excess Insurer – Allied World

Excess insurer Allied World argues that the bacteria exclusions in the First Allied World Policy, the Second Allied World Policy, and the Allied World Choice Policy all preclude coverage.[13] (Rec. Doc. 148). All three policies contain bacteria exclusions for bodily injury "including, but not limited to, Losses, costs or expenses related to, arising from or associated with clean-up, remediation, containment, removal, or abatement, caused directly or indirectly, in whole or in part, by bacteria." Allied World notes that the bacteria exclusion in the First Allied World Policy explicitly supersedes other underlying coverage, while the Second and Choice Allied World Policies are "follow form," and apply the coverage language in their respective underlying policies. Thus, Allied World argues, the First Allied World Policy excludes coverage.

Allied World argues that its Second and Choice Policies preclude coverage because of their bacteria exclusions, notwithstanding the food/drink consumption exceptions in the Second and underlying policies. The underlying policy for the Second Allied Policy is the Century Surety Policy, *see supra* Part II.B.1 – Century Surety, while the underlying policy for the Allied Choice Policy is the Second Scottsdale Policy. The Second Scottsdale Policy excludes bodily injury caused by (1) actual alleged or threatened inhalation or ingestion of (2) contact with**,** (3) exposure to, (4) existence of, or (5) presence of any bacteria in or within building or structure. The Second Scottsdale Policy, the Second Allied Policy and the Century Surety Policy contain a consumption exception. These consumption exceptions provide coverage where the infecting

---

[13] Allied World also makes these exclusion arguments in its motions to dismiss the cross claims of Choice, (Rec. Doc. 254) and Century Surety, (Rec. Doc. 257).

bacteria is from a good for consumption. Allied World argues that the Amended Complaint contains no allegation of bacterial contamination from food or drink, thus the consumption exceptions are inapplicable and the bacteria exclusions preclude coverage.

Three parties respond in opposition to Allied World's motion: Choice (Rec. Doc. 246), CWI (Rec. Doc. 332), and Plaintiffs (Rec. Doc. 336). The parties argue that bacteria not an included definition within the Allied World policies, thus is in ambiguous and should be construed in favor of coverage. Second, the parties argue that the consumption exception applies because Plaintiffs' allegations involve food and drink at the Hotel's restaurant: Gwen and Robert Newberry, for example, allege that they ate lunch at the facility. CWI further contests Allied Word's contention that the First Policy supersedes the Merchants Policy; rather, CWI argues that the First Policy is a follow-form policy, and the Merchants Policy provides coverage. *See supra* Part II.B.2 – Merchants.

### 4.    Excess Insurer – ACE

Excess insurer ACE argues that the bacteria exclusions in its policy preclude coverage for Plaintiffs' claims. (Rec. Doc. 270). ACE argues that its policy excludes coverage for bodily injury "arising out of or in any way related to the actual, alleged, or threatened inhalation of, ingestion of, contact with, exposure to, existence of, or presence of any fungi or bacteria."

Two parties respond in opposition to ACE's motion: Choice (Rec. Doc. 334) and Plaintiffs (Rec. Doc. 335). Choice argues that, at this early stage in the putative class action suit, it would be premature for the Court to take judicial notice without medical evidence that bacteria is the cause of Plaintiffs' injuries. Plaintiffs argue that "bacteria" is not an included definition within the ACE policy, thus is ambiguous and should be construed in favor of coverage.

### 5.      Excess Insurer – American Guarantee

Excess insurer American Guarantee argues that the pertinent bacteria exclusions applicable to its follow-form policies preclude coverage for Plaintiffs' claims. (Rec. Doc. 287). The First American Guarantee Policy is an excess follow-form policy to the ACE Policy (which, in turn, is an excess policy to the First Scottsdale Policy). The Second American Guarantee Policy is an excess follow-form policy to the Allied World Choice Policy (which, in turn, is an excess policy to the Second Scottsdale Policy). Because both American Guarantee policies are follow-form, American Guarantee incorporates by reference the arguments of Allied World, (Rec. Doc. 148), and ACE, (Rec. Doc. 270), for the respective underlying policies. *See supra* Parts II.B.3, II.B.4.

Two parties respond in opposition to ACE's motion: Choice (Rec. Doc. 334) and Plaintiffs (Rec. Doc. 338). Both parties argue that the follow-form American Guarantee polices provide coverage for the same reasons that the parties argue that the corresponding underlying policies provide coverage. *See supra* Parts II.B.3, II.B.4. Choice further argues that the First American Guarantee Policy contains only a "Fungus Liability Exclusion" and does not specifically contain the "Fungus or Bacteria Exclusion" in the ACE Policy. [14]  Choice argues that this is further evidence of ambiguous policy language.

### 6.      Excess Insurer – Ohio Casualty

Excess insurer Ohio Casualty argues that the pertinent bacteria exclusions applicable to its follow-form policies preclude coverage for Plaintiffs' claims. (Rec. Doc. 272). The First Ohio Casualty Policy is an excess follow-form policy to its corresponding first underlying insurance policy: the ACE Policy. The Second Ohio Casualty Policy is an excess follow-form policy to its

---

[14] In its reply, American Guarantee disputes this argument. (Rec. Doc. 360).

corresponding first underlying insurance policy: the Allied World Choice Policy. Because both American Guarantee policies are follow-form, American Guarantee essentially uses the same arguments as those of the corresponding underlying insurers: ACE (Rec. Doc. 270), and Allied World (Rec. Doc. 148). *See supra* Parts II.B.3, II.B.4.

Two parties respond in opposition to Ohio Casualty's motion: Choice (Rec. Doc. 334), and Plaintiffs (Rec. Doc. 339). Both parties argue that the follow-form American Guarantee polices provide coverage for the same reasons that the parties argue that the corresponding underlying policies provide coverage. *See supra* Parts II.B.3, II.B.4.

### 7.    Excess Insurer – National Surety

Excess insurer National Surety argues that the pertinent bacteria exclusions applicable preclude coverage for Plaintiffs' claims. (Rec. Doc. 260). The First National Surety Policy is an excess policy over its corresponding first underlying insurance policy: the ACE Policy. The Second National Surety Policy is an excess policy to its corresponding first underlying insurance policy: the Allied World Choice Policy. First, National Surety argues that its policies both contain bacteria exclusions, which preclude coverage to "any claim or liability arising, in whole or in part, out of, resulting from, caused by, or in any way related to fungi or bacteria." Second, National Surety uses the same arguments as those of the corresponding underlying insurers: ACE (Rec. Doc. 270), and Allied World (Rec. Doc. 148). *See supra* Parts II.B.3, II.B.4. National Surety also notes that its policies state that it has no duty to defend.

Two parties respond in opposition to National Surety's motion: Choice (Rec. Doc. 334), and Plaintiffs (Rec. Doc. 337). Both parties argue that the Ohio Casualty Polices, as follow-form policies, provide coverage for the same reasons that the parties argue that the corresponding

underlying ACE and Allied World Choice Policies provide coverage. *See supra* Parts II.B.3, II.B.4.

### 8. Excess Insurer - Lexington

Excess insurer Lexington argues that the pertinent bacteria exclusions applicable to its follow-form policy preclude coverage for Plaintiffs' claims. (Rec. Doc. 305). The Lexington Policy is an excess follow-form policy to the First Allied World Policy. Lexington makes the same arguments as that of its underlying insurer Allied World as to why the Bacteria exclusion in the First Allied World Policy should be dismissed. (Rec. Doc. 148). *See supra* Part II.B.3.

Choice responds in opposition to Lexington's motion. (Rec. Doc. 345). Choice argues that the follow-form Lexington polices provide coverage for the same reasons that the corresponding underlying policy provide coverage, incorporating by reference its prior arguments, (Rec. Docs 246 at 7-10; 314). *See supra* Part II.B.3.

### C. Claims Outside the Policy Period

Three insurers, Century Surety, ACE and Lexington, seek dismissal of the claims of Plaintiffs that fall outside their Policy periods (Rec. Docs. 263, 270, 305).

Century Surety seeks dismissal of the claims of Jason Beleto, individually, and on behalf of Cruz Beleto, which occurred on January 29-30, 2014 – *before* the commencement of its policy on June 27, 2012, thus precluding coverage. (Rec. Doc. 263). Plaintiffs concede that the Beleto claims allegedly occurred before Century Surety Policy period. (Rec. Doc. 335). Plaintiffs contend, however, that Century Surety remains a viable Defendant for "any current and future claims" of other individuals falling within the policy period.

ACE and Lexington seeks dismissal the claims of the Paternostro, Hesser, and Newberry Plaintiffs, which all occurred *after* the expiration of its policy on June 1, 2012, thus precluding

14

coverage. (Rec. Docs. 270, 305). Plaintiffs concede that the Paternostro, Hesser, and Newberry claims fall after the expiration of the ACE policy period,[15] allegedly occurring in December 2012. (Rec. Doc. 335). Plaintiffs contend, however, that ACE remains a viable Defendant for "any current and future claims" of other individuals falling within the policy period.

### D.    Cross Claims

Various parties seek dismissal, or partial summary judgment, of the cross claims. (Rec. Docs. 254, 257, 265). In addition to the arguments noted above regarding policy exclusions, these cross claim motions fall into several categories, described below.

### 1.    Exhaustion Limits

Allied World argues that the cross claims of Choice and Century Surety should be dismissed because the underlying exhaustion limits have not been met.[16] (Rec. Docs. 254, 257). The plain language of the Allied World Policies state that it has the right and duty to defend in two circumstances: (1) where the underlying insurance has been exhausted or (2) the damages sought would not be covered by the underlying insurance. (Rec. Doc. 254-2 at 76, 254-3 at 86). Under the first scenario, Allied World argues that exhaustion limits have not been met for the corresponding, underlying insurance policies. Allied World argues that this lack of exhaustion alone entitles it to dismissal of Choice's cross claim. Allied World further argues that the second scenario is inapplicable because the Allied World Policies are not broader than the underlying polices. Thus, Allied World seeks dismissal of the cross claims.

Choice and Century Surety respond in opposition. (Rec. Docs. 314, 315). Choice adopts by reference its opposition to Allied World's first motion to dismiss, (Rec. Doc. 246), *see supra*

---

[15] Plaintiffs have not responded to Lexington's arguments, but the analysis appears the same.
[16] In addition to the other arguments herein, Allied World Asserts that it has not duty to Century Surety and that Century Surety's policy is not "excess."

Part II.B.3, asserting that the exclusion issue is not ripe for determination. Century Surety re-avers its arguments in its prior motions for judgment on the pleadings, (Rec. Docs. 263, 265); *see supra* Part II.B.1; *see infra* Part II.C.3. In the alternative, Century seeks declaratory judgment that its Policy applies only to the Policy effective period and that it is entitled to contribution / reimbursement costs for its alleged excess coverage of other policies. Specifically, Century Surety argues that plain language of the "other insurance" provision that the Century Surety Policy is excess while the Third Allied World Policy is primary. Century Surety also argues that the Allied World Policies are not true excess policies but rather are umbrella policies.

### 2.    Choice's Status as an "Additional Insured" under the Century Surety Policy

Century Surety argues, (Rec. Doc. 265), that the cross claim of Choice should be dismissed because (1) "Choice Inc." is not a named/additional insured under the Century Surety Policy at issue, (2) Choice Inc. is not entitled to contractual defense and indemnity for the claims alleged in this lawsuit against Century, and (3) even if Choice had a claim under the Century Surety Policy, it would be excluded under the bacteria exclusion.[17] Specifically, Century Surety asserts that Plaintiffs' allegations concern the independent actions of "Choice *Corp.*" (emphasis added), and that Choice Inc. is not an insured under the Century Surety Policy. Century Surety also argues that it owes no contractual obligation to Choice under the Choice/CWI franchise agreement (CWI is the named insured).

Two parties respond in opposition to Century Surety's motion: CWI (Rec. Doc. 321) and Choice (Rec. Doc. 309). First, Choice and CWI argue that "Choice Inc." was properly named as an "additional insured" in the Century Surety Policy, and that Plaintiffs error in naming the entity

---

[17] *See supra* Part II.B.2 regarding the bacteria exclusion of the Century Surety Policy.

16

incorrectly as "Choice Corp." is not a basis to deny coverage. Second, they argue that the Plaintiffs' complaint alleges both independent negligent of Choice and negligence in its capacity as a franchisor. Lastly, Choice argues that the Century Surety Policy does not unambiguously exclude bacteria.

## III.   LAW AND ANALYSIS

### A.   Legal standard - Dismissal

Both a Rule 12(b)(6) motion to dismiss and a Rule 12(c) motion for judgment on the pleadings are subject to the same standard of review. *Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.,* 313 F.3d 305, 313 (5th Cir.2002). In considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a court accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff. *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007). A 12(b)(6) motion is "viewed with disfavor and is rarely granted." *Turner v. Pleasant*, 663 F.3d 770, 775 (5th Cir. 2011). Dismissal is appropriate only if the complaint fails to plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). To satisfy this standard, the complaint must provide more than conclusions, but it "need not contain detailed factual allegations." *Colony Ins. Co. v. Peachtree Constr., Ltd.*, 647 F.3d 248, 252 (5th Cir. 2011). Yet, it must allege enough facts to move the claim "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570. Determining whether the plausibility standard has been met is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Ashcroft v. Iqbal*, 556 U.S. 662, 664 (2009).

As a general rule, in considering a Rule 12(b)(6) motion to dismiss and a Rule 12(c) motion for judgment on the pleadings, a district court must limit itself to the facts stated in the

complaint. However, there are several exceptions to this rule. For example, a court may also consider documents that a defendant attaches to the motion which are referred to in the plaintiff's complaint and central to the claims therein. *See Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000). In the present matter, the insurance policies are attached to the motions, and are central to the coverage claims in the complaints; thus, the Court will consider these policies in resolving the present motions. *See, e.g.*, *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007).

### B.    Applicable law

In this diversity case, Louisiana law governs.[18] Under Louisiana law, "[a]n insurance policy is an aleatory contract subject to the same basic interpretive rules as any other contract." La. Civ. Code art. 1912, comment (e). "In analyzing a policy provision, the words, often being terms of art, must be given their technical meaning. When those technical words are unambiguous and the parties' intent is clear, the insurance contract will be enforced as written." *Blackburn v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 2000-2668, p. 6 (La. 4/3/01); 784 So. 2d 637, 641 (citations omitted).

An insurer's duty to defend an insured is generally broader than its duty to indemnify. *Hardy v. Hartford Ins. Co.*, 236 F.3d 287, 290 (5th Cir. 2001) (*citing Yount v. Maisano*, 627 So.2d 148, 153 (La. 1993)). "The issue of whether a liability insurer has the duty to defend a civil action against its insured is determined by application of the 'eight-corners rule,' under which an insurer must look to the 'four corners' of the plaintiff's petition and the 'four corners' of its policy to determine whether it owes that duty." *Henly v. Phillips Abita Lumber Co.*, 2006-

---

[18] Louisiana law governs here with the exception of the Franchise Agreement between CWI and Choice, which explicitly states that Maryland law governs.

1856, p. 5 (La. App. 1 Cir. 10/3/07); 971 So.2d 1104, 1109; *see Lamar Adver. Co. v. Cont'l Cas. Co.,* 396 F.3d 654, 660 (5th Cir.2005).

With regard to insurance policy coverage and exclusions, the Louisiana Supreme Court provides, "[a]lthough the insured bears the burden of proving a policy of insurance affords coverage for an incident, the insurer bears the burden of proving the applicability of an exclusionary clause within a policy." *Jones v. Estate of Santiago,* 2003–1424, p. 12 (La.4/14/04); 870 So.2d 1002, 1010 (citing *Doerr v. Mobil Oil Corp.,* 2000–0947, p. 5 (La.12/19/00); 774 So.2d 119, 124, *modified on other grounds on reh'g,* 00–0947 (La.3/16/01); 782 So.2d 573); *see also Blackburn v. Nat. Union Fire Ins. Co. of Pittsburgh,* 2000–2668, p. 6 (La.4/3/01); 784 So.2d 637, 641 ("The insurer bears the burden of proving the applicability of an exclusionary clause within a policy"); *La. Maint. Servs., Inc. v. Certain Underwriters at Lloyd's of London,* 616 So.2d 1250, 1252 (La. 1993) ("The insurer has the burden of proving that a loss comes within a policy exclusion"); Russ, 10A Couch on Insurance § 148:52 (3d ed. 2010). Furthermore, "[p]olicy exclusions must be clearly stated. Any ambiguity in an insurance policy's exclusions is construed to afford coverage." *La. Maint. Servs.,* 616 So.2d at 1252; *see also Yount v. Maisano,* 627 So.2d 148, 151 (La. 1993) ("Any ambiguity in an exclusion should be narrowly construed in favor of coverage"); *see also United Fire & Cas. Co. v. Hixson Bros.,* 453 F.3d 283, 285 (5th Cir. 2006) ("If any facts alleged in the petition support a claim for which coverage is not unambiguously excluded, the insurer must defend the insured.").

## C.    Prescription

Under Louisiana law, delictual actions are subject to a prescriptive period of one year. La. Civ. Code art. 3492. This period starts to run as soon as damage is sustained. *Id.* Louisiana

19

courts have, however, recognized the doctrine of *contra non valentem* in order to mitigate the

occasional harshness of prescriptive statutes. *Kroger Co. v. L.G. Barcus & Sons, Inc.*, 43,804, p.

4 (La. App. 2 Cir. 1/14/09); 2 So. 3d 1163, 1166.  The doctrine works to suspend prescription

"when a cause of action is not reasonably knowable by the plaintiff even though his ignorance is

not induced by the defendant." *Id.* Louisiana courts apply *contra non valentem* in four

circumstances:

> (1) where there was some legal cause which prevented the courts or their
> officers from taking cognizance of or acting on the plaintiff's action; (2) where
> there was some condition coupled with the contract or connected with the
> proceedings which prevented the creditor from suing or acting; (3) where the
> debtor himself has done some act effectually to prevent the creditor from availing
> himself of his cause of action; and (4) where the cause of action is not known or
> reasonably knowable by the plaintiff, even though this ignorance is not induced
> by the defendant.
>
> *Carter v. Haygood*, 2004-0646, p. 11-12 (La. 1/19/05); 892 So. 2d 1261, 1268.

In determining whether prescription has started to run, the court will look at the

reasonableness of the plaintiff's action or inaction. *In re Medical Review Panel of Howard*, 573

So. 2d 472 (La. 1991). *Contra non valentem* "has been held to encompass situations where an

innocent plaintiff has been lulled into a course of inaction in the enforcement of his right by

reason of some concealment or fraudulent conduct on the part of the defendant, or because of his

failure to perform some legal duty whereby plaintiff has been kept in ignorance of his right."

*Carter*, 2004-0646, p. 12; 892 So. 2d at 1269.

Here, the Beleto Plaintiffs have alleged facts in their complaint sufficient to indicate that

it is at least plausible that *contra non valentem* is applicable in this case under the third and

fourth circumstances. Because these motions are being considered under Federal Rule of Civil

Procedure 12(b)(6), the Court must accept all well-pleaded facts as true, viewing them in the

light most favorable to the plaintiff. *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th

Cir. 2011). The Beleto Plaintiffs allege that the statements of Rita Bridges, Defendant's employee, that the hot tub contained nothing but chlorine lulled them into not investigating and thus prevented them from availing themselves of their causes of action. *See Carter*, 2004-0646, p. 11-12; 892 So. 2d at 1268. They further allege that the exact cause of Cruz Beleto's symptoms could not be determined when those symptoms appeared, without additional information known to Defendants, thereby suggesting that "the cause of action [was] not known or reasonably knowable by the plaintiff." *Id.* These facts, accepted as true for the purposes of these 12(b) motions, indicate that it is at least plausible that a reasonable jury could find that the Plaintiffs did not know of their cause of action, and that their inaction was reasonable. Although further discovery might prove that it was unreasonable for the Beletos to delay filing suit, dismissal of the Beleto claims on prescription grounds is inappropriate at this time.

### D.    Coverage

#### 1.    Bacteria Exclusions

As a preliminary matter, the Court must first determine whether Legionella and Pseudomonas aeruginosa constitute "bacteria" within the meaning of the governing policy exclusions. This question, however, is not materially disputed. At oral argument, Plaintiffs acknowledged that Legionella and Pseudomonas aeruginosa are indeed bacterial agents. Since the parties agree on this issue, and it is grounded in fact as explained in the various parties' briefs, the Court concludes that Legionella and Pseudomonas aeruginosa constitute bacteria within the meaning of the respective policies. The instant issue of coverage, then, turns on several factors: (1) whether there is any ambiguity over the scope of the bacteria exclusions in the various policies; and (2) whether any policy exceptions or "buy backs" provide coverage in spite of the bacteria exclusions. The Court will address these questions in turn.

21

### a)      Bacteria exclusions in the governing policies

In this insurance dispute, the Court begins its analysis with the language of the governing policy documents. Here, the various motions to dismiss on issues of coverage involve both primary and excess insurers. *See supra* Part II.B; *infra* Appendix A. Many of the excess insurers are follow-form policies. Effectively, then, four policies govern on the issue of bacteria exclusions:[19]

**<u>Century Surety Policy</u>**

Exclusion for  bodily injury "*arising out of, caused by, or contributed to in any way to the existence, growth, spread, dispersal, release, or escape of any mold, fungi, lichen, virus, **bacteria**, or other growing organism that has toxic, hazardous, noxious, pathogenic, irritating or allergen qualities or characteristics.*" (emphasis added) (Rec. Doc. 263-2 at 48).

**Follow-Form** policy adoption of the Century Surety Policy:
-    **Second Allied Policy**. (*See* Rec. Doc. 148).

**<u>Second Scottsdale Policy</u>**[20]

Exclusion for bodily injury "*which would not have occurred, in whole or in part, but for the actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of, or presence of, any 'fungi' or **bacteria** on or within a building or structure, including its contents, regardless of whether any other cause, event, material or product contributed concurrently or in any sequence to such injury or damage.*" (emphasis added) (Rec. Doc. 148-7 at 42).

---

[19] The Court is not persuaded by CWI's argument that the First Allied Policy is a follow-form policy to the Merchants Policy. Although CWI is correct that generally the First Allied Policy follows the form of the Merchants Policy, (*See* Rec. Doc. 148-2 at 25), the bacteria exclusion in the First Allied Policy explicitly supersedes any coverage provided under the Merchants Policy. *See Chicago Property Interests LLC v. Broussard*, 2008-526 (La. App. 5th Cir. 01/13/09), 8 So. 3d 42, 50 (holding that the more specific language in an insurance policy governs over more general language). As to the bacteria exclusion, then, the First Allied Policy does not follow the form of the Merchants Policy. To reason otherwise would be to render the bacteria exclusion, and its "superseding" language, superfluous. By way of comparison, this superseding nature of the First Allied Policy's bacteria exclusion directly contrasts with those in the Second Allied Policy and the Choice Allied World Policy, the latter of which explicitly provide that their bacteria exclusions "shall not apply" and in such circumstances coverage are follow-form.

[20] Scottsdale has not filed a motion to dismiss based on its policy language. However, a number of the insurers with follow-form policies to the Second Scottsdale Policy have filed motions to dismiss, thus requiring an analysis of the Second Scottsdale Policy.

**Follow-Form** policy adoption of the Second Scottsdale Policy:
- **Allied Choice Policy** (*See* Rec. Doc. 148).
  - Follow-form policy adoption of the Allied Choice Policy: **Second American Guarantee Policy**. (*See* Rec. Doc. 287).
  - Follow-form policy adoption of the Allied Choice Policy: **Second Ohio Casualty Policy**. (*See* Rec. Doc. 272).
  - Follow-form policy adoption of the Allied Choice Policy: **Second National Surety Policy**. (*See* Rec. Doc. 260).

#### First Allied Policy

Exclusion for bodily injury "*caused directly or indirectly, in whole or in part, by bacteria.*" (emphasis added) (Rec. Doc. 148-2 at 14).

**Follow-Form** policy adoption of the First Allied Policy:
- **Lexington Policy**. (*See* Rec. Doc. 305).

#### ACE Policy

Exclusion for bodily injury "*arising out of or in any way related to the actual, alleged, or threatened inhalation of, ingestion of, contact with, exposure to, existence of, or presence of, any fungi or **bacteria**, regardless of whether any other cause, event, material or product contributed concurrently or in any sequence to 'bodily injury' . . . .*" (emphasis added). (Rec. Doc. 270-3 at 16).

**Follow-Form** policy adoption of the ACE Policy:
- **First American Guarantee Policy**. (*See* Rec. Doc. 287).
- **First Ohio Casualty Policy**. (*See* Rec. Doc. 272-2 at 8).
- **First National Surety Policy**. (*See* Rec. Doc. 260-2 at 5).

> **b)**     **Unambiguity of the scope of the bacteria exclusions**

Having found that Legionella and Pseudomonas aeruginosa constitute bacteria, the Court must next assess whether the bacteria exclusions are ambiguous such that the duty to defend applies. Plaintiffs, Choice, and CWI have several central arguments in favor of ambiguity: (1) "bacteria" is undefined in the governing policies; (2) the bacteria exclusions overlap with the

pollution exclusions in several policies, thus rendering those exclusions ambiguous; and (3) the policies must be read as a whole, including the other exclusions, exceptions, and buy backs.

The policies governed by the First Allied Policy (the "First Allied Policy Group") and the policies governed by the ACE Policy (the "ACE Policy Group") do not implicate any exceptions to the exclusions or buy backs. Thus, the question for these Policy Groups is simply whether the language of the respective governing policy exclusions is ambiguous.

Upon assessment of this question, the Court concludes that the bacteria exclusions of the First Allied Policy and the ACE Policy unambiguously exclude coverage. It is undisputed that Legionella and Pseudomonas aeruginosa constitute bacteria. The broadly worded exclusions in both the First Allied Policy and the ACE Policy apply to bodily injury of the type alleged in this litigation. The allegations here are that bacteria present at the Hotel caused a bodily injury through contact, exposure, inhalation, and/or ingestion. These allegations fall well within the provisions of the bacteria exclusions of the First Allied Policy and the ACE Policy. It is immaterial that bacteria is undefined, particularly where it is undisputed Legionella and Pseudomonas aeruginosa constitute bacteria. Thus, the First Allied Policy Group and the ACE Policy Group unambiguously exclude coverage for the alleged injuries, and it is appropriate to issue a declaratory judgment disposing of the claims based on the policies in these Policy Groups. As ACE and Lexington have no other policies involved in this litigation, dismissal is appropriate for these two parties.

Now turning to the significance of the total pollution exclusions in several policies: the mere fact that two of the governing policies, the First Allied Policy and the Century Surety Policies, have pollution exclusions does not render the bacteria exceptions ineffective, as Plaintiffs urge. One unambiguously worded bacteria exclusion, as explained herein, suffices to

exclude coverage as long as there are no applicable exceptions or buy backs. Moreover, under Louisiana law, Legionella and Pseudomonas aeruginosa bacteria do not qualify as "pollutants" within the meaning of these exclusions. In *Doerr v. Mobil Oil Corporation,* 2000–0947; 774 So.2d 119 (La. 12/19/00), the Louisiana Supreme Court was presented with the issue of whether a total pollution exclusion in a commercial liability insurance policy was triggered by claims alleging water contamination caused by discharge from an oil refinery. The exclusion at issue there was similar to this case, excluding from coverage "any injury that 'would not have occurred in whole or part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape' of any 'solid, liquid, gaseous, or thermal irritant or contaminant' at any time." *Id.* at 124. The Court found this provision would lead to absurd consequences if enforced as written since it could be read to exclude any injury from a pollutant and/or contaminant-from a release of toxic gases by a conglomerate chemical plant to a slip-and-fall on spilled gasoline at a corner service station. *Id.* Based thereon, the Court found,

> [T]hat the total pollution exclusion was neither designed nor intended to be read strictly to exclude coverage for all interactions with irritants or contaminants of any kind. Instead, we find that 'it is appropriate to construe a pollution exclusion clause in light of its general purpose, which is to exclude coverage for environmental pollution, and under such interpretation, the clause will not be applied *841 to all contact with substances that may be classified as pollutants.' " *Id.* at 135 (internal citation omitted).

The Court went on to create a set of considerations for determining "[t]he applicability of a total pollution exclusion in any given case." *Id.* These considerations are as follows:

> (1) Whether the insured is a 'polluter' within the meaning of the exclusion;
> (2) Whether the injury-causing substance is a 'pollutant' within the meaning of the exclusion; and
> (3) Whether there was a 'discharge, dispersal, seepage, migration, release, or escape' of a pollutant by the insured within the meaning of the policy. *Id.*

25

In discussing the second prong of what constitutes a "pollutant" within the meaning of

the exclusion, the Louisiana Supreme Court stated that

> [T]he determination of whether the injury-causing substance is a 'pollutant' is also a fact-based conclusion that should encompass a wide variety of factors. As pointed out above, there are a variety of substances that could fall within the broad definition of irritants and contaminants as provided in this policy. For example, under pollution exclusions similar to the one at issue here, courts have found 'pollutant' to include everything from asbestos, carbon monoxide, gasoline, lead paint, and some pesticides; on the other hand, some courts have found that 'pollutants' do not include muriatic acid, styrene resins, and other forms of pesticide. Consequently, when making this determination, the trier of fact should consider the nature of the injury-causing substance, its typical usage, the quantity of the discharge, whether the substance was being used for its intended purpose when the injury took place, whether the substance is one that would be viewed as a pollutant as the term is generally understood, and any other factor the trier of fact deems relevant to that conclusion. *Doerr,* 2000–0947, at p. 26; 774 So.2d at 135.

The total pollution exclusions in these commercial liability insurance policies define

pollutant in essentially the same way: "any solid liquid, gaseous or thermal irritant or

contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals, and waste." (Rec.

Doc. 148-2 at 97; Rec. Doc. 263-2 at 35. Likewise, the provisions exclude coverage for harm

arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or

escape of pollutants. (Rec. Doc. 148-2 at 84; Rec. Doc. 263-2 at 43). Based on this language, and

*Doerr*, the Court concludes that the bacteria Legionella and Pseudomonas aeruginosa do not

qualify as pollutants. The nature of these microbial agents are bacteria, not pollutants as is

"generally understood." *See Doerr,* 2000–0947, at p. 26; 774 So.2d at 135. These bacteria are

significantly different than a typical environmental pollutant and are also distinguishable from

other common "pollutants" such as asbestos, carbon monoxide, gasoline, and lead paint. Nor are

these bacteria "typically used" in the same manner with which the previously discussed

pollutants are used by a "polluter." Rather, these bacteria are simply microorganisms existing in

a natural environment. Finally, they do not discharge, dispersal, seepage, migration in the manner that a typical pollutant does. For these reasons, Legionella and Pseudomonas aeruginosa do not qualify as pollutants, and there is no ambiguous overlap between the bacteria exclusions and the pollution exclusions.

c)        **Exceptions and buy backs**

The policies governed by the Century Surety Policy (the "Century Surety Policy Group") and the policies governed by the Second Scottsdale Policy (the "Second Scottsdale Policy Group") contain various exclusionary exceptions and specific policy endorsements which "buy back" previously excluded coverage. Regardless of whether the bacteria exclusions in these Policy Groups are unambiguous, the Court must determine whether these exceptions and buy backs point towards coverage, thus implicating the duty to defend.

First, the Century Surety Policy Group and Scottsdale Policy Group both contain governing consumption exceptions. Although the language varies slightly for these exceptions, the Court's analysis is the same. The Second Scottsdale Policy, for example, provides coverage for "bacteria that are, are on, or are contained in, a good or product intended for bodily consumption." In another case involving an alleged Legionella outbreak, *Nationwide Mut. Fire Ins. Co. v. Dillard House, Inc.*, 651 F. Supp. 2d 1367, 1379 (N.D. Ga. 2009), the district court analyzed this same policy language and granted summary judgment, ruling that the insurer has a duty to defend under the consumption exception. Specifically, the court found that it was reasonable that hot tub water could fall within a consumption exception with language identical to the Second Scottsdale Policy. *Id.* Notably, the Court indicated that the relevant question was whether multiple reasonable interpretations existed, regardless of the Court's position on the "best" interpretation of the provision. *See id.* at 1377-79.

27

The Court finds *Dillard* persuasive, more so considering that before the Court are 12(b), and not summary judgment, motions. And beyond the policy language, the allegations here further point towards applicability of the consumption exceptions. The parties do not dispute that Plaintiff Gwen Newbery alleged in her original complaint that she ate lunch at the Hotel and was exposed to Legionella at the Hotel. Viewing the pleadings in the light most favorable to Plaintiffs, for the purposes of the instant 12(b) motions, it is plausible that Ms. Newberry acquired Legionnaires' disease through consumption of a good at the Hotel. In such a situation, coverage would apply.

Second, the "Swimming Pool Coverage Buy Back" in the Century Surety Policy also implicates the duty to defend. The Swimming Pool Buy Back provides coverage for bodily injury arising out of "ownership, operation, maintenance, existence, or use of a swimming pool." (Rec. Doc. 263-2 at 52). The allegations here allege bodily injury arising out of the use of the hot tub/spa, which is considered part of a "swimming pool" under the Louisiana Sanitary Code. La. Admin. Code. tit. 51, part XXIV, § 103. Significantly, Plaintiffs' allegations make several specific references to Defendants' negligence in maintaining the pool system. (Rec. Doc. 94 at ¶¶ 25, 27). The injuries, as alleged, would plausibly invoke coverage under the Swimming Pool Buy Back. Although, at oral argument, Century Surety argued that the Swimming Pool Buy Back does not overcome the applicable bacteria exception, this argument is not convincing in light of the fact that the specific Buy Back endorsement explicitly modifies the other general terms of the insurance policy. And, as CWI points out, the Buy Back modification was added at a later date than the bacteria exclusion, thus controls. *See Farr v. Pacific Mut. Life Ins. Co.*, 200 So. 865, 867 (La. 1941) (holding that the last endorsement on an insurance policy controls). Finally, even if the Buy Back were to be viewed as conflicting with the bacteria exclusion, the ambiguity created

by the arguably conflicting provisions further implicates the duty to defend at this stage in the litigation.

Accordingly, at this stage, a duty to defend applies, and a 12(b) dismissal of the Century Surety Policy Group and Scottsdale Policy Group would be inappropriate.

### 2.      Communicable disease exclusion

The Merchants Policy contains a "communicable disease" exclusion with language similar to that the of various bacteria exclusions, excluding coverage "arising in whole or in part, directly or indirectly out of, or which is in any way related to any communicable disease. . ." (Rec. Doc. 268). Unlike the issue of bacteria, a term which encompasses Legionella and Pseudomonas aeruginosa, as materially agreed by the parties, the parties vigorously dispute whether Legionella and Pseudomonas aeruginosa are communicable diseases. Essentially, the parties dispute whether a communicable disease must be transmitted from a person, or whether it can be transmitted from an inanimate environment such as a hot tub, HVAC system, or air/water supply.

In determining whether a 12(b) dismissal is appropriate under such circumstances, the Court is mindful that the insurer bears the burden of proving the applicability of an exclusionary clause within the governing insurance policy. *See United Fire & Cas. Co.,* 453 F.3d at 285 (explaining that if coverage is not unambiguously excluded, the insurer has a duty to defend); *Jones,* 2003–1424, p. 12 (La.4/14/04). Here, Merchants has not unambiguously demonstrated the applicability of its communicable disease exclusion. It is plausible that the contentions of CWI, Choice, and Plaintiffs may well be correct, and discovery may eventually reveal that Legionella and Pseudomonas aeruginosa are not communicable diseases. Nor is it clear whether the injuries

alleged would fall within the exclusion. At this early stage, a 12(b) dismissal on Merchant's communicable disease exclusion would be inappropriate.[21]

### E.     Claims Outside the Policy Period

First, it is undisputed that the Paternostro, Hesser, and Newberry claims fall outside the ACE and Lexington policy periods. (*See* Rec. Docs. 270, 305); *supra* Part II.B.4. Even so, since the Court has found that the ACE and Lexington Policies exclude coverage, thus warranting dismissal of those parties from this litigation, *supra* Part III.D.1.b, the Court need not further address the issue of claims falling outside those policy periods.

Second, it is undisputed that the Beleto claims fall outside the Century Surety Policy period. (*See* Rec. Docs. 263, 270, 305); *supra* Part II.B.4. Even so, the parties essentially agree that regardless of this fact, coverage under such policies may still apply for future putative class members. Since the named Plaintiffs in this suit presently serve as putative class representatives, and the issue of class certification is premature, it would not be appropriate to dismiss insurers from this suit on the basis that certain claims are outside the policy period. If discovery were to eventually indicate that class certification is proper, claims of class members would include injuries within a whole spectrum of dates. Inefficiency and confusion would ensue if this Court would have previously granted the unwarranted dismissal of insurers from this litigation. Therefore, although the Court finds that (1) the Beleto claims fall outside the Century Surety Policy period and (2) the Paternostro, Hesser, and Newberry claims fall outside the ACE and

---

[21] Moreover, the case cited by Merchants, *Alexis v. Southwood Ltd. P'ship.*, *Alexis v. Southwood Ltd. P'ship.*, 2000-1124 at pp. 1, 3 (La. App. 4 Cir. 7/18/01); 792 So. 2d 100, 100, 102, does not answer the question of whether Legionella and Pseudomonas aeruginosa constitute communicable diseases within the meaning of the Merchants Policy. Rather, *Alexis* analyzes – at the summary judgment stage – whether a communicable disease exception applies to sewage contamination. *Id.*

Lexington Policy periods, the Court nonetheless declines to dismiss these insurers from the litigation on this basis.

### F.    Cross Claims

#### 1.    Exhaustion limits

One of Allied World's arguments for dismissal is that its excess policies do not create a duty to defend because exhaustion limits have not been met. (Rec. Docs. 254, 257). However, Louisiana law is clear that the duty to defend extends to both the primary and excess insurer. In *American Home Assurance Company v. Czsarniecki*, the Louisiana Supreme Court held that the duty to defend extends to *both* the primary and excess insurer, as long as the *allegations* in the petition for damages do not unambiguously exclude coverage. *See* 230 So. 2d 253, 269-70 (La. 1969) (emphasis added); *see also* INSURANCE LAW AND PRACTICE, §§ 211, 214 in 15 LOUISIANA CIVIL LAW TREATISE (2d ed. 1996). Significantly, the court in *Czsarniecki* focused on the allegations in the petition, regardless of whether the occurrence fell outside the scope of coverage. *See* 230 So. 2d at 269-70. This duty to defend is expansive enough that "subsequent cases have established that if the petition states any claim within the policy's coverage, the insurer is obligated to defend the entire lawsuit, even the claims that fall outside the policy's coverage."[22] INSURANCE LAW AND PRACTICE, § 211, in 15 LOUISIANA CIVIL LAW TREATISE.

In light of this governing law, there is a duty to defend here for Allied World, even if the exhaustion limits have not yet been met in its Policies. This is particularly so here where the

---

[22] In spite of the *Czsarniecki* rule, if undisputed facts eventually disprove the factual allegations in a complaint and unambiguously demonstrate lack of coverage, an insurer could terminate its duty to defend. Moreover, as explained, *supra* Part III.B, the duty to defend is distinct from the duty to indemnify. If the resolution of the merits reveals no liability for the defendant, there is no duty to indemnify. This discussion also touches upon one of Century Surety's arguments in support of its cross claims for declaratory judgment: that it is entitled to contribution / reimbursement costs and that its Policy only applies to the effective time period. (Rec. Docs. 263, 265). Again, as discussed herein, the duty to defend is broad, and falls upon Century Surety, regardless of whether it eventually has a duty to indemnify. The question of indemnification, including liability for damages in the appropriate time period, is a matter that the Court will not decide at this early stage in the litigation.

policy language of the Allied World Policies does not unambiguously exclude coverage in light of the factual allegations made in the complaint, *see supra* Part III.D.2. Allied World's right to defend provision is written in the disjunctive, and only one of the prongs requires exhaustion:

> [1] "the total applicable limits of Scheduled Underlying Insurance have been exhausted by payment of Loss to which this policy applies and the total applicable limits of Other Insurance have been exhausted; **or** [2] the damages sought because of Bodily Injury, . . . would not be covered by Scheduled Underlying Insurance or any applicable Other Insurance, even if the total applicable limits of either the Scheduled Underlying Insurance or any applicable Other Insurance had not been exhausted by the payment of Loss." (Rec. Docs. 254-2 at 76, 254-3 at 86) (emphasis added).

Under the second prong, Allied World has a duty to defend when "the damages sought" are not covered by the underlying insurance policy. (Rec. Docs. 254-2 at 76, 254-3 at 86). As explained above, the allegations in the complaint may or may not fall within the scope of the Second Allied Policy and the Allied Choice Policy; it is not yet clear at this early stage in litigation. *See United Fire & Cas. Co.,* 453 F.3d at 285 (explaining that if coverage is not unambiguously excluded, then the insurer has a duty to defend); *Czsarniecki,* 230 So. 2d 253, 269-70 (La. 1969); *see also Jones,* 2003–1424, p. 12 (La.4/14/04). As such, Allied World has not unambiguously demonstrated that it has no duty to defend under its defense provisions. Allied World presently has a duty to defend. While discovery might ultimately yield information requiring a different conclusion as to the duty to defend, at this stage dismissal on these grounds would be inappropriate.

> **2.      Choice's status as an "additional insured" under the Century Surety Policy**

Century Surety's arguments in its motion to dismiss the cross claims of Choice are not persuasive. Essentially, Century Surety is asking that the Court not recognize Choice as an

32

"additional insured" under the Century Surety Policy in contravention to the Policy's plain language. The Court will not deny coverage merely because Plaintiffs seemingly mislabeled Choice as "Choice Corp." instead of "Choice Inc." Nor is the Court persuaded by Century Surety's argument that Plaintiffs are making claims against Choice *only* for its independent negligence. Rather, the language in the amended complaint is replete with allegations that Choice was negligent both in its independent actions as well as its actions as franchisor. As such, the complaint alleges negligence of Choice, both in its independent and vicarious capacities. The Court will not, therefore, dismiss Choice's cross claims against Century Surety.[23]

## IV.   CONCLUSION

Based on the foregoing,

**IT IS ORDERED** that Allied World's motion to dismiss and strike, (Rec. Doc. 148), is **GRANTED IN PART** insomuch as the First Allied Policy does not cover the injuries that allegedly occurred during its Policy Period, and is **OTHERWISE DENIED**;

**IT IS FURTHER ORDERED** that Choice's  motion to dismiss, (Rec. Doc. 192), is **DENIED**;

**IT IS FURTHER ORDERED** that Choice's  motion for partial summary judgment on prescription, (Rec. Doc. 193), is **DENIED**;

**IT IS FURTHER ORDERED** that Choice's  motion for partial summary judgment on class claims, (Rec. Doc. 216), is **DENIED**;

**IT IS FURTHER ORDERED** that CWI's motion to dismiss, (Rec. Doc. 251), is **DENIED**;

---

[23] A discussion on the bacteria exclusion is discussed *supra* Part III.D.1.

**IT IS FURTHER ORDERED** that Allied World's motion to dismiss cross-claims, (Rec. Doc. 254), is **DENIED**;

**IT IS FURTHER ORDERED** that CWI's motion for partial summary judgment on indemnity, (Rec. Doc. 255), is **CONTINUED WITHOUT DATE** and the parties shall move to re-notice this motion for submission when appropriate;

**IT IS FURTHER ORDERED** that Allied World's motion to dismiss cross-claims, (Rec. Doc. 257), is **DENIED**;

**IT IS FURTHER ORDERED** that Scottsdale's motion to dismiss, (Rec. Doc. 259), is **DENIED**;

**IT IS FURTHER ORDERED** that National Surety's motion to dismiss and strike, (Rec. Doc. 260), is **GRANTED IN PART** insomuch as the First National Surety Policy does not cover the injuries that allegedly occurred during its Policy Period, and is **OTHERWISE DENIED**;

**IT IS FURTHER ORDERED** that Scottsdale's motion to strike, (Rec. Doc. 261), is **DENIED**;

**IT IS FURTHER ORDERED** that Century Surety's motion for judgment on the pleadings and to strike, (Rec. Doc. 263), is **DENIED**;

**IT IS FURTHER ORDERED** that ACE's motion to dismiss on grounds of prescription, (Rec. Doc. 264), is **DENIED**;

**IT IS FURTHER ORDERED** that Century Surety's motion for judgment on the pleadings, (Rec. Doc. 265), is **DENIED**;

**IT IS FURTHER ORDERED** that Merchant's motion to dismiss, (Rec. Doc. 268), is **DENIED**;

**IT IS FURTHER ORDERED** that Merchant's motion to strike, (Rec. Doc. 269), is **DENIED**;

**IT IS FURTHER ORDERED** that ACE's motion to dismiss for failure to state a claim, (Rec. Doc. 270), is **GRANTED**;

**IT IS FURTHER ORDERED** that Ohio Casualty's motion to dismiss, (Rec. Doc. 272), is **GRANTED IN PART** insomuch as the First Ohio Casualty Policy does not cover the injuries that allegedly occurred during its Policy Period, and is **OTHERWISE DENIED**;

**IT IS FURTHER ORDERED** that American Guarantee's motion for judgment on the pleadings, (Rec. Doc. 287), is **GRANTED IN PART** insomuch as the First American Guarantee Policy does not cover the injuries that allegedly occurred during its Policy Period, and is **OTHERWISE DENIED**;

**IT IS FURTHER ORDERED** that Lexington's motion to dismiss for failure to state a claim, (Rec. Doc. 305), is **GRANTED**.

New Orleans, Louisiana, this 14th day of November, 2014.

_____
UNITED STATES DISTRICT JUDGE

October 1, 2014

# Appendix A

## Coverage Chart: Century Wilshire, Inc.
### *Paternostro v. Century Wilshire, Inc. et al.*, No. 13-662 (E.D. La.)

**Lexington Insurance Company**
Policy No. 013136557
Policy Limits: $5MM occurrence / annual agg.
Excess of: $12MM



**Allied World National Assurance Co.**
Policy No. 0305-6925
Policy Limits: $10MM occurrence / gen. agg.
Excess of: $2MM

**Allied World National Assurance Co.**
Policy No. 0306-8000
Policy Limits: $10MM occurrence / gen. agg.
Excess of: $2MM





**PRIMARY: Merchants National Insurance Co.**
Policy No. CMP I 010167
Policy Limits:  $1MM occurrence /
$2MM aggregate.

**PRIMARY: Century Surety Company**
Policy No. CCP 772319
Policy Limits:  $1MM occurrence /
$2MM aggregate

**POLICY PERIOD 6/27/11 – 6/27/12**

**POLICY PERIOD 6/27/12 – 6/27/13**



October 1, 2014

**Coverage Chart: Choice Hotels International, Inc.**
*Paternostro v. Century Wilshire, Inc. et al.*, No. 13-662 (E.D. La.)

**AIG Specialty Insurance Co.**
**(formerly known as Chartis Specialty Ins. Co.)**
Policy No. PLC 154505616
(1/1/2010 – 6/1/2013)
Policy Limits: $1MM each incident/ $2 MM  policy
aggregate xs $50,000 each incident ded

| **The Ohio Casualty Insurance Co.** | **National Surety Corporation** | **The Ohio Casualty Insurance Co.** | **National Surety Corporation** |
|---|---|---|---|
| Policy No. ECO (12) 53777634 | Policy No. SHX-000-5752-6899 | Policy No. ECO (13) 53777634 | Policy No. SHX-000-4859-3669 |
| Policy Limits: $25MM occurrence / agg. | Policy Limits: $25MM occurrence / agg. | Policy Limits: $25MM occurrence / gen. agg. | Policy Limits: $25MM occurrence / agg. |
| Excess of: $52MM | Excess of: $52MM | Excess of: $52MM | Excess of: $52MM |

**American Guarantee & Liability Ins. Co.**
Policy No. AEC-5345468-06
Policy Limits: $25MM occurrence / gen. agg.
Excess of: $27MM

**American Guarantee & Liability Ins. Co.**
Policy No. AEC-5345468-07
Policy Limits: $25MM occurrence / gen. agg.
Excess of: $27MM




**Ace Property & Casualty Company**
Policy No. M00543779
Policy Limits: $25MM occurrence/ gen. agg.
Excess of: $2MM

**Allied World National Assurance Company**
Policy No. 0307-5775
Policy Limits: $25MM occurrence / gen. agg.
Excess of: $2MM




**PRIMARY: Scottsdale Insurance Co.**
Policy No. BCS0024999
Policy Limits: $1MM occurrence /
$2MM aggregate ($100,000 SIR)

**PRIMARY: Scottsdale Insurance Co.**
Policy No. BCS0027996
Policy Limits: $1MM occurrence /
$2MM aggregate ($100,000 SIR)

**POLICY PERIOD 6/1/11 – 6/1/12**

**POLICY PERIOD 6/1/12 – 6/1/13**